**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**Richmond Division**



PIANKATANK RIVER GOLF CLUB, INC.,

     Plaintiff,

v.                     Civil Action No. 3:08cv606

SELECTIVE INSURANCE COMPANY, <u>et al.</u>,

     Defendants.

## MEMORANDUM OPINION

This matter is before the Court on the Defendants'
Motion for Summary Judgment (Docket No. 10). For the
reasons set forth below, the Motion for Summary Judgment
will be denied.

## BACKGROUND

This matter involves a coverage dispute between an
insured, Piankatank River Golf Club, Inc. ("Piankatank"),
and its insurers, Selective Way Insurance Company, and
Selective Insurance Company of America (collectively
"Selective"). The following facts, which have been
proffered by the parties in their summary judgment

submissions, and then clarified by the admissions made during oral argument, are essentially undisputed.[1]

The Piankatank River Golf Club irrigates its greens and fairways by water pumped from a pond that is fed by two streams emanating from four springs. The pond was created by erecting an earthen barrier that retains the flow of the streams. The spine of the earthen barrier is a concrete retaining wall. Atop and on either side of that wall, there is the earth that forms the barrier, which is alternatively referred to as a "dam" by Selective and a "retaining wall" by Piankatank. Located in the pond near the dam, there is a large surface drain through which water from the pond flows into a main fill and suction culvert. From there, the water is pumped to a pumping station, which pumps the water to the golf course through a system of irrigation pipes. Id. at 4. Excess water from the pond flows through a spillway and then through a culvert that passes below water level through the bottom part of the

---

[1] It its reply, Selective objected to the alleged statement of facts submitted by Piankatank on the grounds that Piankatank's "narrative does not meet the requirement under Rule 56 of the Federal Rules of Civil Procedure for presenting evidence." Def's Reply at 1. Selective has also filed a separate motion to this effect (Docket No. 24). This argument is properly made under Local Rule 56. The material issues in this case, however, respect the application of the essentially undisputed facts to the acknowledged provisions of the insurance policy. Therefore, although Piankatank's objection is well taken, the Court finds that Selective has not been prejudiced by Piankatank's failure to comply with Local Rule 56. Hence, the Motion for Summary Judgment will be decided as briefed and argued.

earthen barrier. Id. This excess water then passes through a ravine and proceeds into the Piankatank River. Id.

On September 1, 2006, tropical storm Ernesto passed over the golf course. The storm deposited five inches of rain over the area and it featured wind gusts of up to 85 miles per hour. Pltf's Opp. at 3. The storm knocked down the limbs of trees and blew debris over the golf course. Id. at 5. The storm also caused a large amount of debris to fall into the pond. Id. In short order, the debris blocked the drain pipe that led to the main fill and suction culvert. With the drain blocked, the water in the pond backed up, rose dramatically, and ultimately flowed over the earthen barrier. Id. The earthen barrier then collapsed, sending a wall of water onto the golf course, destroying a foot bridge, washing out roads, and covering the golf course with earth and debris. Id. Considerable other damage also occurred. Id. Piankatank thus suffered significant property damage and was forced to suspend business operations at the golf club for a period of five days while repairs were made. See id.

Piankatank submitted a damage claim, which included both property damage and lost income, in the amount of $289,170.79. Id. Selective paid Piankatank $27,729.96 for

3

portions of the damage that it deemed to be covered by the policy, but Selective denied coverage for the items of damage that it claims are not covered by the policy.  Id. Accordingly, Piankatank has demanded that Selective pay a balance of $261,440.83.  Id.

The 222-page commercial property insurance policy at the center of this dispute is certainly not a model of clarity.  But, it is a model of the unfortunate state to which insurers and their state regulatory agencies have brought many insurance policies.  There are broad articulations of coverage that are then reduced by definitions of property not covered, covered causes of loss, and exclusions; all of which are reflected in forms that are made applicable merely by reference and without any real effort to set forth simply and plainly how the various sections, exclusions, or endorsements relate to each other.

The parties here base their policy interpretations on selected passages from the main policy and from an endorsement, known as the ELITEPAC Property Extension. Both the main policy and the ELITEPAC endorsement contain sections that bear the same caption without explaining how, if at all, one relates to the other.  No witness testimony has been offered either to explain how the policy operates

4

or to reconcile its overlapping terms and provisions.   Nor is there any evidence about the intent/understanding of the contracting parties.   Consequently, the positions of the parties are predicated largely on the arguments of counsel and are focused on the following sections of the policy.

The pages of the policy have been "Bates" stamped by Selective, and they will be referred to by their Bates stamp numbers.   The following sections of the policy are highlighted by Selective:

- The "Building and Personal Property Coverage Form" of the main policy (p. 64) provides that Selective "will pay for direct physical loss or damage to Covered Property at the premises described in the Declarations caused by or resulting from a Covered Cause or Loss."

- The Commercial Property Coverage Declaration of the main policy (p. 182) lists the buildings associated with the golf course, but it does not list a "dam." This section also lists the "Property Not Covered" by the policy, which includes: trees, plants, ponds, lakes, and other bodies of water.

- The Building and Personal Property Coverage Form of the "ELITEPAC Property Extension" (p. 108) in Section I expands the definition of "covered property" to include a wide-ranging list of property at the golf course, including: tees, greens, sand traps, foot or cart bridges, roads, paved surfaces, *retaining walls*, and pump houses.   However, this Coverage Form does not provide coverage for "dams."

- The "Exclusions" section of the main policy (pp. 94-95) is prefaced by the admonition that Selective "will not pay for loss of damage caused *directly or indirectly* by any of the following.   Such loss or damage is excluded *regardless of any cause or event that contributes concurrently or in any sequence to the loss*."   Included in this list of exclusions is

5

damage due to: (1) earth movement (including landslide and "earth sinking, rising or shifting which cause settling, cracking, or other disarrangement of foundations or other parts of realty"); or (2) water, which includes "[f]lood, surface water, waves, tides, tidal waves, *overflow of any body of water or their spray, all whether driven by wind or not,"* and mudslide or mudflow.

See Def's Mot. at 2-5 (emphases added).

In response, the following sections of the policy are highlighted by Piankatank:

- The "Broadened Water" coverage section of the ELITPAC (pp. 108-109) covers *"direct loss or damage"* caused by *"water that backs up from a sewer, drain, or sump."*

- The "Additional Coverage Extensions" in Section F.2 of the Covered Cause of Loss section of the main policy (p. 102) afford coverage for any loss caused by "covered water," and provide that Selective "will also pay the cost to tear out and replace any part of the structure to repair damage to the system from which the water escapes."

- The "Extra Expense" section of the Broadened Water - Direct Damage part of the ELITEPAC (pp. 111-112) covers losses incurred "during the period of restoration" which stem from any business losses necessary "to avoid or minimize the suspension of business" and to repair affected property affected. This extension is only applicable "to the extent it reduces the amount of loss that otherwise would have been payable."

- The "Water Supply Services" section of the Utility Services-Direct Damage part of the ELITEPAC (p. 118) covers "pumping stations and water mains" which supply water to the insured premises, provided that the loss directly results from a "Covered Cause of Loss."

- The "Broadened Water - Business Income" section of the ELITEPAC (p. 121) provides coverage for any actual loss of income resulting from the necessary suspension

6

of operations due to "water that backs up or overflows from a sewer drain or sump."

- The "Utility Services" provision of the Broadened Water-Business Income section (p. 122) covers business income loss due to direct physical loss of water supply services, meaning pumping stations and water mains supplying water to the premises.

- The "Tees Greens and Cut Fairways Coverage Form" section of the ELITEPAC (p. 182) covers tees, greens, cut fairways, practice greens, and maintained playing surfaces.

- The "Business Income Coverage" section of the "Tees, Greens, and Cut Fairways Coverage Form" provides coverage for loss of income from unplayablilty of the course due to physical damage to the golf course.

See Pltf's Opp. at 7-10 (emphases added).[2]   The proper interpretation of the foregoing provisions lies at the heart of the dispute between the parties.  See id.

On February 13, 2009, Selective filed this Motion for Summary Judgment (Docket No. 10) asserting that: (1) the "dam" was not "covered property" under the terms of the policy; and (2) the losses sustained by Piankatank fall within two policy exclusions (water and earth movement), and thus coverage is precluded under the policy.  The motion has been fully briefed and is now ripe for decision.

---

[2]  Both Piankatank and Selective have proffered expert testimony interpreting the scope of the coverage provided by the foregoing policy provisions.   See generally Def's Mot. at 14; Pltf's Opp. at 11, 12. These experts, however, merely assert legal conclusions and will not be considered by this Court in deciding this motion.   See, e.g., North River Ins. Co. v. Reinsurance Corp., 197 F. Supp. 2d 972, 981 (S.D. Ohio 2002) ("Expert opinions which express a legal conclusion are not admissible.").

## DISCUSSION

### I.    The Applicable Legal Standard

Summary judgment is appropriate where there is no genuine issue as to any material fact. See Fed. R. Civ. P. 56(c). Once a motion for summary judgment is properly made and supported, the opposing party has the burden of showing that a genuine dispute exists. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986). A material fact in dispute appears when its existence or non-existence could lead a jury to different outcomes. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A genuine dispute exists when there is sufficient evidence on which a reasonable jury could return a verdict in favor of the non-moving party. See id.

Summary judgment is appropriate when, after discovery, a party has failed to make a "showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). When a motion for summary judgment is made, the evidence presented must always be taken in the light most favorable to the non-moving party. See Smith v. Virginia Commonwealth Univ., 84 F.3d 672, 675 (4th Cir. 1996). A non-moving party cannot, however, "create a

8

genuine issue of material fact through mere speculation or the building of one inference upon another." Beale v. Hardy, 769 F.2d 213, 214 (4th Cir. 1985). Accordingly, the party who bears the burden of proof at trial cannot survive summary judgment without sufficient evidence to sustain his or her burden of proof on that point. Celotex Corp., 477 U.S. at 327. These precepts and standards govern the resolution of the instant motion. See Swann v. City of Richmond, 498 F. Supp. 2d 847, 853 (E.D. Va. 2007).

## II. Whether The "Dam" Is "Covered Property" Under The Policy

Even if the damage to the golf course was caused by a "covered cause of loss,"[3] Selective contends that "the dam itself is not a 'covered property' insured by the Selective policy. Accordingly, [Piankatank] is not entitled to its replacement cost." Def's Mot. at 15.

It is clear that in order to invoke coverage under the policy, Piankatank must establish that it suffered a loss related to "covered property." See Policy at 64. The "Commercial Property Coverage Declaration" of the main policy lists the property covered by the policy. The Coverage Declaration does not explicitly include "dams" under the terms of its coverage. See id. Notably,

---

[3] The issue of whether the damage to the golf course was from a "covered cause of loss" is addressed, infra.

9

however, the ELITEPAC endorsement expanded the definition
of "covered property" to include additional property. <u>See</u>
Policy at 108. Specifically, the ELITEPAC endorsement
provided additional coverage by stating:

> You may extend the insurance provided by this
> Coverage Form *to apply to*: foot or cart bridges,
> roads, walks, patios, and other paved surfaces
> adjacent to holes; *retaining walls*; statues;
> fountains; monuments; pump houses; hole markers;
> ball washers; water coolers; cups; flags;
> directional signs; benches; tee markers; portable
> comfort stations; tennis courts; lightning
> detection/warning systems; towers; lights and
> poles; used in operation of the golf course,
> caused by or resulting from any Covered Causes of
> Loss. The most we will pay for loss or damage
> under this Extension is $250,000.

ELITEPAC, Section I, Additional Covered Property - Golf
Courses/Country Clubs, p. 108 (emphasis added). Piankatank
argues that this additional coverage for "retaining walls"
encompasses the "dam" that was destroyed by the storm.
Pltf's Opp. at 8. In Contrast, Selective argues that the
omission of the word "dam" from the policy requires its
exclusion from coverage. Def's Reply at 4.[4]

---

[4] Specifically, Selective contends that "it is apparent from the many
[Virginia] cases in which retaining walls and dams have been
considered, that both terms are distinct and unambiguous, and
[Piankatank's] definition is contrary to the ordinary meaning." As
Selective notes, however, no court in Virginia has specifically
addressed this issue. <u>See</u> <u>id.</u> And, the Virginia cases cited by
Selective that have used the terms "dam" or "retaining wall" have done
so in the context of situations where the meaning of the these terms
was undisputed. <u>See</u>, <u>e.g.</u>, <u>Haynie v. Brenner</u>, 216 Va. 722 (1976);
<u>Peerless Ins. Co. v. County of Fairfax</u>, 274 Va. 236, 244 (2007).
Therefore, this argument is unpersuasive.

10

A retaining wall is defined as "a wall built to hold back water or the earth of an embankment." Webster's New Lexicon of the English Language 1546 (2d ed. 1988). One court has held that "[t]he terms 'dam' and 'retaining wall' are significantly different in both their literal meanings and their ordinary understandings. The [] dam was not excluded under the provision for retaining walls in the insurance contract." City of Bryan v. Gulf Ins. Co., 2001 U.S. Dist. LEXIS 3124, at *14, 15 (N.D. Ohio Jan. 17, 2001). Other courts, however, appear to have concluded that a "retaining wall" is an integral part of a "dam." See, e.g., Richardson v. United States, 248 F. Supp. 99, 101 (E.D. Okla. 1965). And, certain courts appear to use the words interchangeably. See, e.g., Shell v. Evarts, 296 Ky. 602, 604 (1944) ("[The plaintiff] negligently constructed *a dam or retaining wall* at the mouth drift of this old, abandoned mine for the purpose of impounding and holding back the large volume of water that had accumulated therein.") (emphasis added).

Quite clearly, the law alone does not supply a definitive resolution of the issue presented by Selective's motion. More importantly, it is undisputed that the literal spine of the earthen barrier is a concrete retaining wall, and that a segment of that wall was torn

11

away by the forces pressing against it.  On either side of the spinal wall (and atop it) were several feet of earth. Hence, there is a cogent basis by which to conclude that the concrete retaining wall, which was bolstered by several feet of earth on each side, served to retain the water in a retention pond from where the water was drained and pumped through the pump house to the irrigation pipes.  On these facts, a reasonable jury might conclude that the barrier was a "retaining wall" within the meaning of the policy.

Given the unsettled nature of the semantic argument advanced by the parties, and considering the factual record before this Court, this issue should be resolved by a jury. Therefore, summary judgment is inappropriate on this issue.[5]

### III. Whether The Losses At Issue Were Excluded By A "Covered Cause Of Loss"

In general, "courts interpret insurance policies, like other contracts, in accordance with the intention of the parties gleaned from the words they have used in the document."  Floyd v. Northern Neck Ins. Co., 245 Va. 153, 158 (1993).  Each component of an insurance contract "should be considered and construed together and seemingly conflicting provisions harmonized when that can be

---

[5] Selective also makes the stronger argument that "the dam was specifically identified as 'Property Not Covered' in Section A(2)(h)" of the policy.  Def's Mot. at 16.  A review of Section A(2)(h), however, reveals nothing of the sort.  See Policy at 65.

reasonably done, so as to effectuate the intention of the parties as expressed therein." <u>Suggs v. The Life Ins. Co. of Virginia</u>, 207 Va. 7, 11 (1966). When a policy does not define a given term, a court must give the word its "ordinary and accepted meaning." <u>Scottsdale Ins. Co. v. Glick</u>, 240 Va. 283, 288 (1990).

"Where an insured has shown that his loss occurred while an insurance policy was in force, but the insurer relies on exclusionary language in the policy as a defense, the burden is upon the insurer to prove that the exclusion applies to the facts of the case . . . ." <u>Bituminous Cas. Corp. v. Sheets</u>, 239 Va. 332, 335 (1990)). Importantly, however, "if the damage is caused by two causes, one of which is excluded [by the policy], the law upholds the exclusion of the entire damage." <u>Mayton v. Auto-Owners Ins. Co.</u>, 2006 U.S. Dist. LEXIS 28952, at *14 (E.D. Va. May 2, 2006) (citing Virginia law). For instance, in <u>Lower Chesapeake Ass'n v. Valley Forge Ins. Co.</u>, 260 Va. 77 (2000), the Supreme Court of Virginia upheld a "water exclusion" provision where damage to a dock was caused, in part, by *wind-driven water*. <u>Id.</u> at 87. Likewise, in <u>Transcon. Ins. Co. v. RBMW, Inc.</u>, 262 Va. 502 (2001), the Supreme Court of Virginia found that a "flood" exclusion

provision was unambiguous, and thereby denied the plaintiff's claim. Id. at 513.

Nevertheless, it is equally clear that when an insurer drafts language setting forth exclusions that limit its coverage under a policy, the insurer is required to use language that "clearly and unambiguously" defines the scope of the exclusions. See, e.g., S.F. v. West Am. Ins. Co., 250 Va. 461, 465 (1995); Granite State Ins. Co. v. Bottoms, 243 Va. 228, 233 (1992). Hence, if the challenged exclusionary provisions are ambiguous, so that they may be reasonably understood in more than one way, the Court must interpret the policy in a manner that provides coverage. See, e.g., S.F., 250 Va. at 464.

A.   The "Exclusions" Section Of The Policy

The language of the main insurance policy executed between the parties excludes coverage for "direct or indirect" damage due to "water," including "flood, surface water, waves, tides, tidal waves, overflow of any body of water or their spray, all whether driven by wind or not." Causes Of Loss - Special Form, Section B. Exclusions, pp. 94, 95. The policy also excludes coverage for damage due to "earth movement." Id. On the other hand, damage due to "wind" is covered by the policy. See id.

14

The parties concede, however, that the main version of the policy was superseded by the later-executed ELITEPAC Property Extension.  See Policy at 108.  In sharp contrast to the categorical water exclusion provision in the main policy, the ELITEPAC Property Extension provides coverage for damage caused by "direct loss or damage" due to "water that backs up from a sewer, drain or sump."  See Policy at 108.  In this respect, the ELITEPAC explicitly "modifie[d]" the prior coverage of the main policy to provide for the "broadest coverage" possible.  Id.  However, the ELITEPAC Property Extension did not modify the prior exclusion for "earth movement," so this exclusion continues to apply.

### B.   The Provisions Of The Policy Respecting "Water" And Causation

Piankatank contends that the damage to the golf course was due to the "wind" of the tropical storm, and was not due to the rain that the storm brought down on the golf course.  Pltf's Opp. at 9.  To this end, Piankatank states:

> The evidence conclusively shows that no flooding occurred from rain or waves, tidal waves, the Piankatank did not overflow (it is a large tidal river), and the wind did not drive any waters, surface or otherwise, to cause the major losses sustained by the club.  All of the club's witnesses testified in depositions and each one of them stated that there was virtually no rain before the wind sheared the limbs, etc. from the trees and stopped up the dam's drain. *Except for the windstorm, no damages would have been suffered by the club.*

Id. at 9, 10 (emphasis added).  In contrast, Selective argues that "it is clear . . . that the losses sustained at Piankatank Golf Course resulted from the flow of the water through the course following the failure of the dam." Def's Mot. at 18.

In its motion, Selective relies heavily on the decision in Mayton v. Auto-Owners Insurance Company.  In Mayton, the court was faced with an "exclusion" provision that excluded both "direct and indirect" damage from "water," including the "overflow of a body of water."  See 2006 U.S. Dist. LEXIS at *1.  On summary judgment, the insurance company claimed that the Mayton's "cottage sustained damage and/or destruction directly or indirectly, concurrently, or in some sequence by waves, tidal water, and overflow of the James River."  Id. at *2.  In contrast, the Maytons contended that there was "a genuine issue of material fact whether the 'cause and/or origin' of the damage to the house was a result of wind, water, or a combination of both."  Id. at *2.  In ruling in favor of the insurance company, the court held that, even accepting the plaintiff's evidence, "it is still undisputed that water caused concurrent or sequential damage to the house.

This [water] damage is specifically excluded by the policy the Maytons had with the Defendant." Id. at *17, 18.

Similar to the evidence proffered in Mayton, Selective has presented the deposition testimony of a number of Piankatank agents to prove that "water" was a significant cause of the damage to the golf course. Varying slightly, their testimony reveals the following sequence of events: (1) the force of the storm caused debris to fall into the pond; (2) this debris caused a stoppage in the drain and caused the water level in the pond to rise; (3) the water level eventually crested over the top of the earthen barrier; and (4) the barrier eventually gave way, thereby creating a flood of water and mud that spread debris across the golf course. See Def's Mot. at 6-13. Based on this testimony, it is clear that "water" played an integral role in damaging the property for which Piankatank now seeks damages. Consequently, the damage from the storm fits squarely within the situation contemplated by the "water" exclusion provision of the main policy.

Nevertheless, there is a material distinction between the facts of this case and the facts present in Mayton. As noted above, the ELITEPAC endorsement superseded the "water" exclusion provision of the main policy to provide coverage for damage caused by "water that backs up from a

17

sewer, drain or sump." Pltf's Opp. at 8. Piankatank claims that this language "unequivocally" provides coverage to the damage sustained by the golf course. Def's Opp. at 11. Selective objects to this "tenuous" application of the Broadened Water extension because "[n]ot only would the Court be rewriting the policy to characterize the water outlet pipes of the dam as a 'drain,' but the water which ultimately caused the dam to fail did not flow from or backup from a drain." Def's Reply at 8.

At oral argument, however, Selective conceded, in substance, that the outlet pipes which were blocked by the debris constitute a "drain." Moreover, the deposition testimony which is cited by Selective indicates that the drain was "stopped" up by the debris blown into the pond by the storm. See Def's Mot. at 7, 10. The confluence of these two facts makes the coverage of the Broadened Water extension at least plausibly applicable to the present dispute. Hence, at this juncture, summary judgment must be denied with respect to Selective's contention that the "water" exclusion in the main policy bars coverage.[6]

---

[6] It should also be noted that the Broadened Water extension only provides coverage for "*direct* loss or damage" caused by "water that backs up from a sewer, drain or sump." See Policy at 108 (emphasis added). Neither party has addressed the issue of whether the damage to the golf course was the "direct" result of backed-up water. Such sensitive issues of causation, particularly when unaddressed by the parties, are not appropriate for resolution on summary judgment.

C. **The Provisions Of The Policy Respecting "Earth Movement" And Causation**

Even if the "water" exclusion provision does not bar recovery, Selective contends that the "exclusion for earth movement would still, of course, be applicable, and erosion and failure of the *earthen dam* during the storm . . . would still fall within this exclusion and preclude recovery by Piankatank." Def's Reply at 6 (emphasis added).

As noted above, the earth movement exclusion section precludes recovery for either "direct or indirect" damage to the course caused by: (2) "[l]andslide, including any earth sinking, rising, or shifting related to such event;" or (4) "[e]arth sinking (other than sinkhole collapse), rising or shifting including soil conditions which cause settling, cracking, or other disarrangements of foundations or other parts of realty.   Soil conditions include contraction, expansion . . . erosion . . . and the action of water under the ground surface."[7] See Policy at 94.

When giving the words of the "earth movement" exclusion provision their "ordinary and accepted meaning," see Glick, 240 Va. at 288, the damage caused by the failure of the earthen barrier cannot properly be excluded from coverage by the "landslide provision" of subparagraph (2).

---

[7] The other subjections of the earth movement exclusion provision (*e.g.*, earthquakes) are patently inapplicable to the present matter.

Webster's dictionary defines a landslide as "the rapid downward movement under the influence of gravity of a mass of rock, earth, or artificial fill on a slope." Webster's Third New International Dictionary 1269 (1981). Based on this definition, Selective conceded at oral argument that this subsection of the earth movement exclusion provision is inapplicable to the instant matter.

Selective relies, therefore, on the fourth subsection of the earth movement exclusion provision to argue for the exclusion of coverage. Based on the plain language of this subsection, however, it is clear that there is a genuine dispute of material fact as to whether it properly applies to the facts of this case. First, neither party contends that the earthen barrier failed due to earth "sinking" or "rising." See Policy at 94. Moreover, far from "shifting," "settling," or "eroding" the earthen barrier, or causing the "disarrangement" of the soil composing the barrier, the storm resulted in the complete *destruction* of the earthen barrier.[8]

---

[8] On the whole, the exclusions in this provision appear to contemplate damage which results from the gradual movement of the earth/soil over time; a situation which is entirely distinguishable from the sudden destruction of realty due to a tropical storm. For instance, "erosion" is defined as "the gradual and imperceptible wearing away of land from the shore or bank." Black's Law Dictionary 524 (8th ed. 2004). Moreover, this conclusion is buttressed by the explicit exclusion of a "sinkhole collapse;" an event which is notable for its rapidity. See id.

20

Hence, when drawing all reasonable inferences in favor of Piankatank, and when construing any ambiguity in the policy in favor of coverage, it is evident that a reasonable jury could find that the losses at issue were not within the scope of the "earth movement" provision. Thus, the "earth movement" exclusion also fails to provide a basis for summary judgment.

## CONCLUSION

For the foregoing reasons, the Defendant's Motion for Summary Judgment (Docket No. 10) is denied.

It is so ORDERED.

_____/s/_____ _REP_

Robert E. Payne
Senior United States District Judge

Date: April 15, 2009
Richmond, Virginia

21