IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
Richmond Division



PIANKATANK RIVER GOLF
CLUB, INC.,

    Plaintiff,

v.                                        Civil Action No. 3:08cv606

SELECTIVE WAY INSURANCE
COMPANY, et al.,

    Defendants.

### MEMORANDUM OPINION

This matter is before the Court on DEFENDANTS' MOTION *IN LIMINE* TO REDUCE *AD DAMNUM* AND LIMIT EVIDENCE ON DAMAGES (Docket No. 23); PLAINTIFF'S MOTION *IN LIMINE* (Docket No. 26); DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY FROM BRYAN BIELECKI (Docket No. 27); and DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY FROM THOMAS H. VEITCH (Docket No. 28).

### BACKGROUND

This action involves a coverage dispute between an insured, Piankatank River Golf Club, Inc. ("Piankatank"), and its insurers, Selective Way Insurance Company, and Selective Insurance Company of America (collectively "Selective"). The following facts, which have been proffered by the parties in their summary judgment submissions, and then clarified by the

admissions made during oral argument, are essentially undisputed.

The Piankatank River Golf Club irrigates its greens and fairways by water pumped from a pond that is fed by two streams emanating from four springs. The pond was created by erecting an earthen barrier that retains the flow of the streams. The spine of the earthen barrier is a concrete retaining wall. Atop and on either side of that wall, there is the earth that forms the barrier, which is alternatively referred to as a "dam" by Selective and a "retaining wall" by Piankatank. Located in the pond near the dam, there is a large surface drain through which water from the pond flows into a main fill and suction culvert. From there, the water is pumped to a pumping station, which pumps the water to the golf course through a system of irrigation pipes. Id. at 4. Excess water from the pond flows through a spillway and then through a culvert that passes below water level through the bottom part of the earthen barrier. Id. This excess water then passes through a ravine and proceeds into the Piankatank River. Id.

On September 1, 2006, tropical storm Ernesto passed over the golf course. The storm deposited five inches of rain over the area and it featured wind gusts of up to 85 miles per hour. Pltf's Opp. at 3. The storm knocked down the limbs of trees and blew debris over the golf course. Id. at 5. The storm also

2

caused a large amount of debris to fall into the pond. Id. In short order, the debris blocked the drain pipe that led to the main fill and suction culvert. With the drain blocked, the water in the pond backed up, rose dramatically, and ultimately flowed over the earthen barrier. Id. The earthen barrier then collapsed, sending a wall of water onto the golf course, destroying a foot bridge, washing out roads, and covering the golf course with earth and debris. Id. Considerable other damage also occurred. Id. Piankatank thus suffered significant property damage and was forced to suspend business operations at the golf club for a period of five days while repairs were made. See id.

Piankatank submitted a damage claim, which included both property damage and lost income, in the amount of $289,170.79. Id. Selective paid Piankatank $27,729.96 for portions of the damage that it deemed to be covered by the policy, but Selective denied coverage for the items of damage that it claims are not covered by the policy. Id. Accordingly, Piankatank has demanded that Selective pay a balance of $261,440.83. Id.

As previously noted by the Court, the 222-page commercial property insurance policy at the center of this dispute is certainly not a model of clarity. But, it is a model of the unfortunate state to which insurers and their state regulatory agencies have brought many insurance policies. There are broad

3

articulations of coverage that are then reduced by definitions of property not covered, covered causes of loss, and exclusions; all of which are reflected in forms that are made applicable merely by reference and without any real effort to set forth simply and plainly how the various sections, exclusions, or endorsements relate to each other.

The parties here base their policy interpretations on selected passages from the main policy and from an endorsement, known as the ELITEPAC Property Extension. Both the main policy and the ELITEPAC endorsement contain sections that bear the same caption without explaining how, if at all, one relates to the other. No witness testimony has been offered either to explain how the policy operates or to reconcile its overlapping terms and provisions. Nor is there any evidence about the intent/understanding of the contracting parties. Consequently, the positions of the parties are predicated largely on the arguments of counsel and are focused on the following sections of the policy.

The pages of the policy have been "Bates" stamped by Selective, and they will be referred to by their Bates stamp numbers. The following sections of the policy are highlighted by Selective:

- The "Building and Personal Property Coverage Form" of the main policy (p. 64) provides that Selective "will pay for direct physical loss or damage to Covered Property at the

4

premises described in the Declarations caused by or resulting from a Covered Cause or Loss."

- The Commercial Property Coverage Declaration of the main policy (p. 182) lists the buildings associated with the golf course, but it does not list a "dam." This section also lists the "Property Not Covered" by the policy, which includes: trees, plants, ponds, lakes, and other bodies of water.

- The Building and Personal Property Coverage Form of the "ELITEPAC Property Extension" (p. 108) in Section I expands the definition of "covered property" to include a wide-ranging list of property at the golf course, including: tees, greens, sand traps, foot or cart bridges, roads, paved surfaces, *retaining walls*, and pump houses. However, this Coverage Form does not provide coverage for "dams." Potential coverage under the ELITEPAC is capped at $250,000.

- The "Exclusions" section of the main policy (pp. 94-95) is prefaced by the admonition that Selective "will not pay for loss of damage caused *directly or indirectly* by any of the following. Such loss or damage is excluded *regardless of any cause or event that contributes concurrently or in any sequence to the loss*." Included in this list of exclusions is damage due to: (1) earth movement (including landslide and "earth sinking, rising or shifting which cause settling, cracking, or other disarrangement of foundations or other parts of realty"); or (2) water, which includes "[f]lood, surface water, waves, tides, tidal waves, *overflow of any body of water or their spray, all whether driven by wind or not*," and mudslide or mudflow.

See Def's Mot. at 2-5 (emphases added).

In response, the following sections of the policy are highlighted by Piankatank:

- The "Broadened Water" coverage section of the ELITPAC (pp. 108-109) covers *"direct loss or damage"* caused by *"water that backs up from a sewer, drain, or sump."* This coverage is capped at $100,000.

5

- The "Additional Coverage Extensions" in Section F.2 of the Covered Cause of Loss section of the main policy (p. 102) afford coverage for any loss caused by "covered water," and provide that Selective "will also pay the cost to tear out and replace any part of the structure to repair damage to the system from which the water escapes."

- The "Extra Expense" section of the Broadened Water -Direct Damage part of the ELITEPAC (pp. 111-112) covers losses incurred "during the period of restoration" which stem from any business losses necessary "to avoid or minimize the suspension of business" and to repair affected property affected.  This extension is only applicable "to the extent it reduces the amount of loss that otherwise would have been payable."

- The "Water Supply Services" section of the Utility Services-Direct Damage part of the ELITEPAC (p. 118) covers "pumping stations and water mains" which supply water to the insured premises, provided that the loss directly results from a "Covered Cause of Loss."

- The "Broadened Water - Business Income" section of the ELITEPAC (p. 121) provides coverage for any actual loss of income resulting from the necessary suspension of operations due to "water that backs up or overflows from a sewer drain or sump."

- The "Utility Services" provision of the Broadened Water-Business Income section (p. 122) covers business income loss due to direct physical loss of water supply services, meaning pumping stations and water mains supplying water to the premises.

- The "Tees Greens and Cut Fairways Coverage Form" section of the ELITEPAC (p. 182) covers tees, greens, cut fairways, practice greens, and maintained playing surfaces.

- The "Outdoor Trees, Shrubs, and Plants" section of the ELITEPAC (p. 116) extends coverage to trees, shrubs, and plants, including debris removal expense, which results from damage due to a covered cause of loss.

- The "Business Income Coverage" section of the "Tees, Greens, and Cut Fairways Coverage Form" provides coverage

for loss of income from unplayablilty of the course due to physical damage to the golf course.

See Pltf's Opp. at 7-10 (emphases added). The proper interpretation of the foregoing provisions lies at the heart of the dispute between the parties. See id.

On April 15, 2009, the Court issued a Memorandum Opinion denying Selective's Motion for Summary Judgment (Docket No. 33). Thereafter, four motions in limine were filed by the parties. Selective has filed three of these motions in limine: (1) Defendants' Motion in Limine to Exclude Expert Testimony From Bryan Bielecki (Docket No. 27); (2) Defendants' Motion to Exclude Expert Testimony From Thomas H. Veitch (Docket No. 28); and (3) Defendants' Motion in Limine to Reduce *Ad Damnum* and Limit Evidence on Damages (Docket No. 23). Piankatank has also filed a Motion in Limine (Docket No. 26) ·to exclude all opinion evidence of two of Selective's Proffered expert witnesses: Gary Jakubowski and Samuel Corso. These motions have been fully briefed and are now ripe for decision.

                              DISCUSSION

I.   Selective's Motion To Exclude The Testimony Of Thomas
     Veitch

Piankatank has proffered the testimony of Thomas Veitch, Esq. as an expert witness at trial. Piankatank contends that Veitch is a "preeminent expert in insurance coverage and claims adjusting," and that his testimony will "be offered to explain

                                  7

how the policy operates and/or to reconcile its overlapping terms and conditions." Pltf's Opp. at 2.

As noted in the Memorandum Opinion denying summary judgment, "[e]xpert opinions which express a legal conclusion are not admissible." <u>North River Ins. Co. v. Reinsurance Corp.</u>, 197 F. Supp. 2d 972, 981 (S.D. Ohio 2002). Furthermore, it is settled that it is typically improper for a court to rely on expert testimony for the purposes of interpreting certain terms and/or clauses of a contract. See <u>Forest Creek Assoc. v. McLean Savs. and Loan Ass'n</u>, 831 F.2d 1238, 1242 (4th Cir. 1987) ("Here again the commitment agreement speaks for itself, and its proper interpretation is a question of law. Thus, we find that the district court was correct in excluding expert testimony proffered by the plaintiffs for the purpose of interpreting the [contract]."); <u>cf. Brewer v. Lincoln Nat'l Life Ins. Co.</u>, 921 F.2d 150, 154 (8th Cir. 1990) ("[I]t would be improper and unfair to allow experts to define terms that were specifically written for and targeted toward lay persons."). Veitch's proposed testimony, which seeks to interpret the challenged provisions of the Insurance Policy, is improper under the established application of Fed. R. Evid. 702. Therefore, Selective's Motion To Exclude The Testimony Of Thomas Veitch (Docket No. 28) will be granted.

## II.     Pianktank's Motion To Exclude The Testimony Of Gary Kabubowski And Samuel Corso

Piankatank has challenged the proposed testimony of two of Selective's expert witnesses: Gary Jakubowski and Samuel Corso. Primarily, Piankatank contends that both proposed experts have insufficient training/experience to qualify as experts under Rule 702, and Piankatank also argues that their "proposed opinions are not the product of reliable principles and methods." See Pltf's Mot. at 1.

### A. The Expert Qualifications Of Jakubowski And Corso

It is axiomatic that one must be deemed an "expert" in order to testify under Fed. R. Evid. 702, which provides that a witness can be qualified as an expert by "knowledge, skill, experience, training, or education." Id. These bases for qualification are disjunctive, Friendship Heights Assoc. v. Vlastimil Koubek, 785 F.2d 1154, 1158 (4th Cir. 1986), and whether a witness is qualified as an expert can only be determined by the nature of the opinion offered. Thus, experience may be a crucial component for one type of expert opinion, whereas training may be essential for another. See, e.g., Berry v. City of Detroit, 25 F.3d 1342 (6th Cir. 1994).

Generally, courts have been reluctant to exclude an expert on the ground that he is unqualified. Courts have not required a party to show that the witness is an outstanding expert, or to

show that the witness is well-known or respected in the field; these are generally questions of weight. See, e.g., Ellis v. K-Lan Co., 695 F.2d 157, 161 (5th Cir. 1983) (an expert's lack of familiarity with a statutory standard affects the weight and not the admissibility of his testimony).

Based on the foregoing, it appears that both Jakubowski and Corso can qualify as experts in their respective disciplines. Since 1977, Jakubowski has been active in adjusting property losses under insurance contracts, and he also has significant technical expertise in civil engineering and construction. Def's Opp. at 2.  Likewise, Corso has over 30 years of experience in the adjustment of property losses and in the application of the terms of insurance contracts to property damage claims. Id.  Therefore, by virtue of both their training and experience in the insurance field, both Jakubowski and Corso are qualified to opine on the relevant issues in this case.

## B. The Asserted Relevance Of The Expert Testimony

Of course, to be admissible under Rule 702, proffered expert testimony must still be "helpful" to the trier of fact.  See Friendship Heights Assocs., 785 F.2d at 1159.  A review of the affidavits provided by both Jakubowski and Corso demonstrates that their testimony suffers from the same infirmity as the proposed testimony of Veitch.  Namely, the proposed testimony of these experts attempts to interpret the language of the

10

Insurance Policy. <u>See</u> Corso Affidavit at 1 ("Veitch's conclusions regarding the interpretation of the Selective Policy are, in my view, contrary to the clear and unambiguous language contained therein."); Jakubowski Affidavit at 2 ("In the customary and ordinary sense of the term . . . [a] dam simply is not a retaining wall."). Such "interpretative" testimony is improper under Rule 702. <u>See</u> <u>Forest Creek Assoc.</u>, 831 F.2d at 1242. Therefore, Piankatank's Motion in Limine to exclude the testimony of Gary Kabubowski and Samuel Corso (Docket No. 26) will be granted.

### III. Selective's Motion To Reduce *Ad Damnum* And Limit Evidence on Damages

Selective argues that, under the "Broadened Water - Direct Damage" provision of the ELITEPAC, which caps recoverable damages at $100,000, Piankatank should be limited in its ability to claim damages in excess of $100,000. Def's Mot. at 2. In contrast, Piankatank claims that this express policy coverage of up to $100,000, when coupled with certain other provisions of the ELITEPAC that provide additional coverage beyond this $100,000 limit, permit Piankatank to offer evidence of damages up to $250,000. <u>See</u> Pltf's Opp. at 3. To revolve this dispute, a brief exposition of the salient provisions of the ELITEPAC is necessary.

At oral argument on the Motion for Summary Judgment, both parties conceded that, if there is coverage for the damage to the golf course in this case, it must be grounded in the ELITEPAC Property Extension. Section I of the ELITEPAC caps coverage at $250,000 for any and all damage to "Additional Covered Property."[1] Policy at 108. Hence, although the total possible coverage under the individual provisions of the ELITEPAC could greatly exceed $250,000, this amount represents the upper-limit for any compensable damage claims which are asserted under the ELITEPAC. See id.

Importantly, under the Broadened Water - Direct Damage provision, coverage is limited to $100,000 for any damage to "Covered Property" which is fairly traceable to any "*direct* loss or damage caused by water that backs up or overflows from a sewer drain or sump." Policy at 109. This cap applies notwithstanding the fact that the scope of possible coverage under the ELITEPAC totals $250,000.[2] See id. The Broadened Water - Direct Damage provision is, however, subject to an important caveat in that the "Broadened Water - Business Income" provision provides coverage for "actual loss of business income" sustained by "water that backs up or overflows from a sewer

---

[1] This Additional Covered Property section provides coverage for retaining walls, bridges, and roads. Id.

[2] Accordingly, there is no textual conflict between the $250,000 Additional Covered Property cap and the $100,000 coverage limitation under the Broadened Water - Direct Damage provision.

drain or sump." Policy at 121. That coverage is also capped at $100,000. Id. Therefore, even if this loss of business income is traceable to the type of damage covered by the Broadened Water - Direct Damage provision, it is also compensable under the policy. See id. This yields a total of $200,000 in coverage for damage under the two Broadened Water provisions of the ELITEPAC.

The other coverage provisions of the ELIPEPAC, however, can augment the $100,000 recovery under the two Broadened Water provisions, provided that the damage claimed under each additional provision falls outside of the scope of the two Broadened Water provisions. Based on an examination of the itemized list of damages which has been tendered by Piankatank, the other ELITEPAC provisions which *plausibly* fall outside of the Broadened Water cap on coverage in this case include, *inter alia*: Outdoor Trees, Shrubs, and Plants ($10,000 cap); Extra Expense ($50,000 cap), so long as such expense "reduces the amount of loss that otherwise would have been payable"; Refrigerated Property - On Premises ($10,000 cap); and Inground Sprinkler Systems. See Policy at 108-121. Again, however, if the damage to these specific pieces of property was directly "caused by water that backs up or overflows from a sewer drain or sump," then it will be subject to the limitations on coverage

13

enumerated in the two Broadened Water provisions of the
ELITEPAC.

It is therefore evident that Selective is seeking a
limitation on coverage that is unduly restrictive given the
various coverage provisions of the ELITEPAC.  In contrast,
however, Piankatank appears to be ignoring the evidentiary
limitations that it will face at trial when attempting to claim
coverage under the various provisions of the ELITEPAC.  Given
Piankatank's statements at oral argument, it seems plausible
that, once the evidence on causation is presented at trial,
Piankatank will be significantly constrained in its ability to
claim coverage outside of the Broadened Water provisions.
Nevertheless, at this juncture, it is not possible to further
opine on the scope of coverage available to Piankatank, except
to caution that, although coverage of up to $250,000 is
theoretically available under the provisions of the ELITEPAC,
any coverage claimed by Piankatank must be closely tied to the
evidence presented at trial.  Therefore, Selective's Motion in
Limine to Reduce *Ad Damnum* and Limit Evidence on Damages (Docket
No. 23) will be denied.

### IV.  Selective's Motion To Exclude The Testimony Of Bryan Bielecki

Selective also objects to the proposed testimony of Bryan
Bielecki.  In his deposition, Bielecki was asked to provide an

14

opinion regarding the potential impact to the golf course of having no irrigation water during the month of September in 2006. Def's Mot. at 6. Selective objects to this testimony due to the fact that: (1) this "hypothetical" scenario never occurred; and (2) the opinions offered by Bielecki have "no grounding whatsoever in a reliable scientific technology." Id.

### A. The Hypothetical Nature Of Bielecki's Testimony

As a preliminary matter, there is nothing that prohibits putative experts from considering either "hypothetical" scenarios or "estimates" when formulating their expert conclusions. See Arocho v. Sec'y of Health & Human Servs., 670 F.2d 374, 375 (1st Cir. 1982). These expert conclusions must be proven to be reliable, and they must be sufficiently tied to the factual scenario before the jury so as to be helpful to the trier of fact. See id. However, if these criteria are met, any lingering concern over the hypothetical nature of an expert's testimony affects its weight, but not its admissibility. See, e.g., Ellis v. K-Lan Co., 695 F.2d 157, 161 (5th Cir. 1983).

In this case, it is evident that the "hypothetical" testimony provided by Bielecki is sufficiently tied to the facts of this case so as to be admissible under Rule 702. In his expert report, Bielecki based his conclusions on the specific type of grass present at the golf course, and he also took into account the type of regular maintenance and landscaping that is

conducted at the golf course. See Bielecki Report at 1, 2. Also, Bielecki based his financial conclusions upon a "business model" that is the same as the business model employed by the Piankatank River Golf Course. See Def's Mot. at 3. Moreover, Bielecki is intimately familiar with the Piankatank River Golf Course, as he is the Vice President for Agronomy for Billy Casper Golf, the management company that manages/owns the Piankatank River Golf Club. Bielecki Report at 1. Taken together, although Bielecki's expert testimony makes a number of assumptions (a valid counterpoint that can be elicited on cross-examination), his testimony is sufficiently reliable and helpful so as to qualify for admission under Rule 702.

## B. The Relevance Of Bielecki's Testimony

Selective also contends that Bielecki's testimony is irrelevant because it is predicated upon a scenario that never occurred. See Def's Mot. at 2. In response to this argument, Piankatank states the following:

> The relevance of his testimony will be to show what losses the Club faced if it did not immediately restore its irrigation system, first as temporary extra expense due to direct physical loss and damage incurred during the period of restoration that would not have incurred if it had not lost irrigation; to minimize the suspension of business and to continue operations to repair or replace the property so damaged; as well as its duty to mitigate its losses - all this being covered losses under the ELITEPAC, P. 111 "Extra Expenses," as well as other provisions of the Policy.

16

Pltf's Opp. at 2 (emphases added).

As explained above, the "Extra Expense" section of the ELITEPAC provides that Selective "will pay any Extra Expense to avoid or minimize the 'suspension' of businesses and to continue operations," including the cost to "repair or replace any property . . . to the extent it reduces the amount of loss that otherwise would have been payable under this Coverage Form." Policy at 111.   This Extra Expense coverage is capped at $50,000.   Id. at 112.   Hence, Selective's argument that Bielecki's testimony is irrelevant because it is predicated upon a scenario that never occurred is misguided.   Indeed, the Extra Expense section requires such "hypothetical" analysis by stating that it will pay for Piankatank's expenses under this subsection, but only to the "to the extent it reduces the amount of loss that *otherwise would have been* payable under this Coverage Form."   Id. at 111 (emphasis added).

Beyond this point, however, it is difficult to determine the appropriate limitations on Bielecki's testimony.   Foremost, it is clear that any loss claimed under the Extra Expense section must stem from a covered cause of loss.   Id.   Any such loss must also reduce the amount of coverage which would otherwise have been compensable under the ELITEPAC.   Id.   Thus, any testimony by Bielecki under the Extra Expense subsection of the ELITEPAC is only conditionally relevant and is subject to

17

the satisfaction of these requirements.   Moreover, the coverage limitations enumerated in Section III of this Memorandum Opinion, *supra*, continue to apply to any testimony offered by Bielecki at trial.   Fundamentally, however, whether Bielecki's testimony is admissible will depend on whether a factual predicate is laid at trial.   But, the grounds asserted in Selective's motion for excluding his testimony are without merit.     Therefore, Selective's Motion to Exclude Expert Testimony From Brian Bielecki (Docket No. 27) will be denied.

## CONCLUSION

For the foregoing reasons, (1) DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY FROM BRYAN BIELECKI (Docket No. 27) will be denied, with judgment reserved on the admissibility of his proposed testimony until trial; (2) DEFENDANTS' MOTION TO EXCLUDE EXPERT TESTIMONY FROM THOMAS H. VEITCH (Docket No. 28) will be granted; (3) DEFENDANTS' MOTION *IN LIMINE* TO REDUCE *AD DAMNUM* AND LIMIT EVIDENCE ON DAMAGES (Docket No. 23) will be denied; and (4) PLAINTIFF'S MOTION *IN LIMINE* (Docket No. 26) will be granted.

It is so ORDERED.

_____/s/_____   *REP*

Robert E. Payne
Senior United States District Judge

Richmond, Virginia
Date:  May 11, 2009

18